Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

**Dated: September 13th, 2017**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| IN RE: | CASE NO. 1:17-bk-10001 |
|---|---|
| RICKY CARL WEIKLE and VIVIAN EUGENIA WEIKLE, | CHAPTER 13 |
| Debtors. | JUDGE FRANK W. VOLK |

**MEMORANDUM OPINION AND ORDER
VALUING 1989 FLEETWOOD SPG FH
MANUFACTURED HOME AND LAND
LOCATED AT 222 CLANCY WEIKLE ROAD, UNION, WV 24983**

Pending are Debtors Ricky and Vivian Weikle's Amended Objection to Claim Number 1 held by Creditors Rose Acceptance, Inc. and First National Bank of America (collectively, "FNB"), [Dckt 29], along with FNB's Objection to Confirmation of Debtors' Amended Chapter 13 Plan and to Value of Allowed Secured Claim. [Dckt 39]. The Weikles' Amended Plan [Dckt 31] contains a motion to value the secured claim held by FNB.

The Court held an evidentiary hearing on May 11, 2017, took the matter under advisement, and directed the parties to file supplemental pleadings. The Court is vested with jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

**I.**

Vivian and Ricky Weikle purchased a manufactured home[1] in 1989 and placed it on a parcel of land at 222 Clancy Weikle Road, Union, West Virginia. The Weikles did not own the land at the time. They received it by conveyance in 2000.

In 2010, the Weikles took out a loan from FNB. The loan was secured by a vehicle title lien on the manufactured home and a deed of trust on the land. The Deed of Trust, however, contained the following provision granting FNB a security interest in the land "together with all existing or subsequently attached or affixed buildings, improvements and fixtures.…" Further, the Deed of Trust defines improvements as "all existing and future improvements, buildings, structures, mobile homes affixed on the real property, facilities, additions, replacements and other construction on the real property."

The loan was refinanced in 2012 with the same collateral. The promissory note executed January 19, 2012, states the Weikles were to repay the $35,500 principal balance through 120 monthly payments with an interest rate of 12.99%. The proceeds from the financing and refinancing were not used to purchase the land or the manufactured home. The Weikles already owned both by that time. The Weikles are, however, now indebted to FNB in the amount of $42,923.58.

---

[1] The Weikles assert that the structure at issue is a "mobile home," while FNB contends it is a "manufactured home." The distinction is immaterial. A "'mobile home' is merely an antiquated term for a 'manufactured home,'" *Russel v. Town of Granville*, 237 W. Va. 9, 11 n.3, 784 S.E.2d 336, 338 n.3 (2016), referring only to homes built prior to 1974. *Carr v. Michael Motors, Inc.*, 210 W. Va. 240, 246–47, 557 S.E.2d 294, 301-02 (2001). A mobile home and a manufactured home are now "the same thing" under West Virginia law. *Id.*

The Weikles petitioned for relief under Chapter 13 on January 4, 2017. The Weikles' unconfirmed Chapter 13 plan contains a motion to value FNB's secured claim, proposing a valuation of $18,611.28 and providing for payment of $21,330 to FNB. On January 10, 2017, FNB filed a secured claim for $42,923.58. The Weikles objected to the claim, as did FNB concerning confirmation of the Weikles' plan.

The Weikles contend that the amount of FNB's secured claim is $18,611.28 -- the combined value of the manufactured home, worth $13,411.28, and the land, worth $5,200 -- with the remainder of the debt being unsecured. FNB argues that the manufactured home is part of the Weikles' real property, meaning that the manufactured home and the land may not be valued separately and the debt cannot be bifurcated into secured and unsecured portions under 11 U.S.C. § 1322(b)(2). FNB claims that the value of the land and the manufactured home together is $63,000, and thus the entirety of its debt is secured by the real property. The Weikles respond that the manufactured home is personal property, not real property, and therefore the anti-modification provision of § 1322(b)(2) does not apply.

## II.

**A. Governing Standard**

Chapter 13 permits individuals to, within limits, flexibly adjust their debts via a repayment plan confirmed by the bankruptcy court. *See Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015) ("Chapter 13 allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period."); *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 327 (1993). The statutory ingredients for a confirmable plan are sprinkled throughout Chapter 13 of the Bankruptcy Code but found in other locations as well.

For example, 11 U.S.C. § 506(a) -- which governs the determination of secured-party status -- used in conjunction with § 1322 -- covering the contents of a Chapter 13 plan -- are consulted when one inserts in a proposed plan a bifurcation of a secured creditor's claim into secured and unsecured portions when the claim exceeds the value of the secured property. *See Bank of America, N.A. v. Caulkett*, 135 S. Ct. 1995, 2000 (2015); *In re Alvarez*, 733 F.3d 136, 139 (2013). The instant dispute centers on the permissible interplay between the section 506(a) claim-bifurcation rubric and the § 1322(b)(2) anti-modification provision. In sum, the Weikles seek, and FNB resists, a modification of FNB's rights through claim bifurcation.

The anti-modification proviso found in 11 U.S.C. § 1322(b)(2) covers when a Chapter 13 plan may "modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*." *Id.* (emphasis added); *Rake v. Wade*, 508 U.S. 464, 469 n.5 (1993); *Anderson v. Hancock*, 820 F.3d 670, 673 (4th Cir. 2016). This proviso has two requirements: "first, the security interest must be in real property, and second, the real property must be the debtor's principal residence." *Ennis v. Green Tree Servicing, LLC (In re Ennis)*, 558 F.3d 343, 345–46 (4th Cir. 2009).[2] It is undisputed that the manufactured home is the Weikles' principal residence. The question is whether the manufactured home is personal or real property. Inasmuch as the correct characterization of the property is a

---

[2] Our court of appeals' decision in *Ennis* involved a claim secured by an interest in a mobile home situated on leased real estate. As in this case, ownership of the mobile home was evidenced by a motor vehicle title. Unlike this case, however, (1) the home was taxed as personal property, and (2) the applicable security agreement prohibited the mobile home from becoming a fixture or otherwise characterized as personal property without the lender's consent.

The circumstances in *Ennis* are sufficiently distinct from this case, to the end that a broader analysis is necessary to determine if the subject manufactured home is personal or real property.

matter of state law, *In re Ennis*, 558 F.3d at 346, and that there is lacking any controlling statutory authority, the Court turns to the West Virginia common law of fixtures.[3]

In *Snuffer v. Spangler*, 79 W. Va. 608, 609, 92 S.E. 106, 107 (1917), the Supreme Court of Appeals of West Virginia addressed an ownership dispute over machinery placed for twenty-five (25) years in a building on a small tract of land. The machinery consisted, *inter alia*, of a wool picker, spinning machine, three looms, and one reel. The machinery stood on its own legs much as "a desk stands upon the floor of a room." *Id.* at 609, 92 S.E. at 107. The spinning

---

[3] There are certain statutory provisions that bear on whether a manufactured home is real or personal property under West Virginia law. A few examples will suffice. First, West Virginia Code section 37-15-1 provides that it is the purpose of Article 15 to "clarify the ambiguity and confusion related to the classification of factory-built homes as real or personal property, particularly relating to security interests." *Id.* The article, however, is of little assistance in this setting, where the owner of the home and the parcel upon which it sits are one in the same. *See id.* ("The provisions of this article apply to factory-built homes, as defined herein, which are held as personal property situated on real property owned by another in conjunction with a landlord/tenant relationship.").

Second, the Weikles appear to assert that, inasmuch as they did not cancel their manufactured home vehicle title in accordance with a West Virginia statute, the home necessarily could not become a fixture. The statute they reference, West Virginia Code section 17A-3-12b(a), provides pertinently as follows: "The commissioner may cancel a certificate of title for a mobile or manufactured home affixed to the real property of the owner of the mobile or manufactured home. The person requesting the cancellation shall submit to the commissioner an application for cancellation together with the certificate of title." *Id.* The statute speaks only to the conditions precedent to canceling a certificate of title on a manufactured home and the consequences resulting. If this statute were construed in the categorical fashion urged by the Weikles, it would prohibit a manufactured home from ever becoming a fixture. Had the Legislature intended such a far-reaching result, it would have unquestionably used more sweeping language.

Third, a corresponding measure, West Virginia Code section 11-5-12, provides that a "mobile home" permanently attached to the owner's real estate may not be classified as personal property if the owner has complied with section 17A-3-12b(a). The immediately preceding observation by the Court concerning the Legislature's approach applies to this measure as well. Additionally, section 17A-3-12b(a) offers no guidance concerning whether a manufactured home becomes a fixture to the land for all purposes. This appears so inasmuch as the statute, like its many counterparts in Chapter 11 of the West Virginia Code, are concerned only with the proper levy and collection of tax revenue.

These provisions, whether apart or in combination, do not purport to prescribe the only means by which a manufactured home becomes part of an owner's real property. Further, none of the statutes identified during the research process govern the precise circumstances in this case.

wheel, however, was operated on a track much like a railroad car. None of the machines were fastened to the building. They could all "be easily removed without damage or injury either to the machinery or to the building" and all were assessed as personal property. *Id.*

Commencing with the decision in *Snuffer*, the Supreme Court of Appeals has maintained a tripartite test for ascertaining whether an item is a fixture or a piece of personal property. As stated in *Snuffer*:

> From the foregoing authorities we conclude that personal property used in connection with real estate is fixtures and part of the realty, when the following conditions concur: *First*, It must be attached to the real estate, and by this we do not mean that it has to become so attached as to do serious damage to the realty, or to the property itself in order to remove it, but that it must be so attached as that the two, the real estate and the fixtures, work together to one end; *second*, it must be reasonably necessary and adapted to the purposes for which the real estate is being used; and, *third*, it must be the intention of the party placing such property upon the real estate to make it a part thereof.

*Id.* at 637-38, 92 S.E. at 110 (quoted in part in *In re Boden Mining Corp.*, 11 B.R. 562, 564 (Bankr. S.D. W. Va. 1981) (emphasis added); Syl. Pt. 2, *West Virginia Dept. of Highways v. Thompson*, 375 S.E.2d 585, 586, 180 W.Va. 114, 115 (1988). When the first two requirements are satisfied, there is a rebuttable presumption that the party intended to create a fixture. *Id*.

**B. Analysis**

The Weikles' manufactured home is attached to the land through its connection to a septic system and to the electrical grid. It is additionally surrounded by a cinderblock wall that would need to be removed in order to transport the home. Also, the wheels, axles, and hitches necessary for transport have been removed. It seems clear, then, that the attachment requirement is satisfied. Were that not the case, however, as noted in *Snuffer*, a fixture need not "be[ ] so attached as to do serious damage to the realty, or to the property itself in order to remove it." *Id*.

6

79 W. Va. at 637, 92 S.E. at 110. Instead, the structure and the real estate must only be sufficiently attached that they "work together to one end." *Id.* Here, that end is to provide the Weikles a place to live. Their manufactured home and the land upon which it sits work together to provide a living space that has a set location and address with basic utilities and attachments.

Regarding the second requirement, the manufactured home is also "reasonably necessary and adapted to the purposes for which the real estate is being used." *Snuffer*, 79 W. Va. 638, 92 S.E. at 110. The Weikles use their land as a part of their residence. The manufactured home -- as a structure providing shelter, safety, and other necessities -- is reasonably necessary for and suited to this purpose.

Inasmuch as the manufactured home is both attached to the Weikles' land and reasonably necessary for the Weikles to live upon their land, the law presumes they intended to adjoin it to their real estate. That presumption is in accordance with the Court's finding of fact based upon the following evidence.

The Weikles have stated that the land is "highly undesirable," is "accessible by dirt road on top of a mountain," and does not have a water source. [Dckt 77 at 8]. FNB's appraiser noted that the land would not appeal to many prospective buyers. *Id*. Presumably, the most desirable aspect of this parcel is that it is the location of the Weikles' home. It seems likely that the Weikles chose to acquire this otherwise undesirable land because they intended to continue living in the home they had placed upon it. Additionally, owning both the manufactured home and the land upon which it sits would have given the Weikles the security of knowing they could not be ousted by a lessor, which is a concern common to many who own manufactured homes.

The Court notes Mrs. Weikle's testimony that she and her spouse did not intend for the manufactured home to be permanent and that they wished to replace it with a new manufactured home. The manufactured home has been on the parcel of land for 28 years, however, and there is no evidence that the Weikles have ever taken steps to move or replace it. Mrs. Weikle additionally testified that, at the present time, the Weikles have no intention to move the home.

Were this evidence insufficient to demonstrate the requisite intent required by the third *Snuffer* factor, Mrs. Weikle further testified that the home has always been taxed as real property. There is no indication that the Weikles ever sought to have their manufactured home taxed as personal property. This leads to a reasonable inference the Weikles viewed the manufactured home as a part of their real property.

For the above reasons, the Court finds that the Weikles have adduced insufficient evidence to rebut the presumption that they intended their manufactured home to be a part of their real estate. The manufactured home has become a fixture of their land and is a part of their real property. The land and the manufactured home thus may not be valued separately.

**C. Valuation**

At the evidentiary hearing, Robert J. Linkous, an expert in manufactured home valuation and sale, testified that the value of the manufactured home, standing alone, is $13,411.28. Mr. Linkous reached this figure using the National Automobile Dealers Association (NADA) guide for manufactured homes, taking into account the age and condition of the home.

George Yost, FNB's appraiser, testified that the value of the mobile home and the land taken together is $63,000. Mr. Yost arrived at this figure by analyzing putatively comparable sales of manufactured homes attached to real property. Mr. Yost additionally testified that the

value of the land alone was $10,000 and the value of the manufactured home alone was $42,036. Mr. Yost reached his valuation of the manufactured home using the Marshall and Swift Cost Manual. Mr. Yost's appraisal indicates his belief that the value of this particular property increases by 21.07% when the manufactured home and the land are valued together.

The Weikles concur with Mr. Linkous that the value of the manufactured home is $13,411.28 and further opine that the value of the land is $5,200. The Weikles base their land valuation on the fact that it is a "highly undesirable" location on the top of a mountain and accessible only by dirt road. Additionally, the appurtenant septic system does not work properly, and there is no water well sunk into the land. The Weikles assert that the absence of a well drastically impacts the value of the property.

This Court finds the Weikles' and Mr. Linkous' valuation of the manufactured home standing alone, separate from the land, to be persuasive. There are many defects in Mr. Yost's appraisal that, in sum, crater his valuation. When conducting his appraisal, Mr. Yost did not enter the Weikles' property. Rather, the extent of his evaluation consisted of viewing the property from the road and analyzing what he deemed to be comparable sales.[4] His appraisal of the property also does not inspire high confidence based upon his incorrect determination that there was a well on the property. Reasonable diligence would have disclosed otherwise. Additionally, having not entered the property, Mr. Yost was unable to consider the poor condition of the manufactured home in arriving at his valuation.

---

[4] The comparable sales that Mr. Yost used exceeded the limitations on distance that are customarily observed. Further, there is no information respecting the age or condition of the homes he deemed comparable. It is thus unclear whether these sales are properly considered companions.

Mr. Linkous, by contrast, testified that the condition of the manufactured home was quite poor. As noted by Mrs. Weikle, the poor septic system attached to the home causes sewage to come up through drains. There are also parts of the floor that are rotting, holes in the walls, and broken cabinets, doors, and windows. Additionally, both the front and back porches need to be replaced, the carpet is torn, and the shower does not work properly. These many impairments, which Mr. Yost did not observe, indicate that its value is significantly less than his calculations. Mrs. Weikle's belief that she could realistically sell the manufactured home for $10,000 also supports a lower valuation.

The Court additionally finds the Weikles' valuation of the land to be persuasive. A septic system and a water source are generally considered to be necessities for a residential property. Both wells and septic systems are expensive to install. The fact that the Weikles' parcel lacks these necessities significantly depresses its value.

Accordingly, the Court finds persuasive the values proffered by the Weikles of the manufactured home and the land taken separately. Inasmuch as the Court has deemed the Weikles' manufactured home as a fixture to their real property, however, the valuation must be of the home and the land combined. Inasmuch as there is no reasoned justification for opining otherwise on the current evidentiary record, the Court treats the valuation of the property as a whole as the combined separate values of the land and the manufactured home, which is $18,611.28.

Accordingly, this Court finds that the total valuation of the real property, encompassing both the manufactured home and the land, is $18,611.28. It is **ORDERED** that the Amended Objection to Claim Number 1 be, and hereby is, **SUSTAINED** and the Objection to Confirmation of Debtors' Amended Chapter 13 Plan be, and hereby is, **OVERRULED**.